Filed 10/21/21  P. v. Jackson CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. ALONZO JACKSON, JR., Defendant and Appellant. | F081570 (Super. Ct. No. CF92472108) OPINION |

-ooOoo-

### THE COURT*

APPEAL from a judgment of the Superior Court of Fresno County.  David Andrew Gottlieb, Judge.

John F. Schuck, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Jeffrey D. Firestone, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

\*　　Before Detjen, Acting P. J., Meehan, J. and Snauffer, J.

## INTRODUCTION

In 1995, a jury convicted petitioner Alonzo Jackson, Jr., of two counts of first degree murder (Pen. Code,[1] § 187), with a robbery-murder special circumstance (§ 190.2, subd. (a)(17)), and a multiple-murder special circumstance (§ 190.2, subd. (a)(3)).[2] For these offenses, he was sentenced to two consecutive terms of life without the possibility of parole.

In 2019, petitioner filed a petition for resentencing pursuant to section 1170.95. The court summarily denied the petition on the ground that petitioner was a major participant in the underlying felony who acted with reckless indifference to human life, a disqualifying factor pursuant to section 1170.95, subdivision (a)(3).

On appeal, petitioner asserts he established a prima facie claim for resentencing relief, and the court therefore erred in denying the petition without issuing an order to show cause. We conclude the court did not err in denying the petition without issuing an order to show cause because the record establishes petitioner is ineligible for resentencing as a matter of law. Accordingly, we affirm.

## FACTUAL AND PROCEDURAL HISTORY

In this court's opinion on petitioner's direct appeal, we described the facts leading to his convictions as follows:

> "In May 1992, Wayne Carr made his living as a drug dealer. During this time he lived with Sheldon Logan and his girlfriend, Heidi, in their apartment in Fresno. In the early morning hours of May 14, 1992, Officer Albert Hernandez, of the Fresno Police Department was responding to a call near Logan's apartment when he saw a young woman run, screaming, out of an apartment building, get in a car, and drive off. When Hernandez approached the apartment from which he had seen the young woman run, he saw the door was open. Upon looking inside, he observed a body. Hernandez and another officer then entered the apartment and found the body of a man on his knees, with his head pushed against the couch and a

---

[1]    Undesignated statutory references are to the Penal Code.

[2]    Petitioner also was convicted of other offenses, as described below.

cushion over it.  Hernandez also observed a young woman lying on the floor in a corner.

"Hernandez called for assistance and while he was waiting for other officers to arrive, the young woman who had run out of the apartment returned.  She was Veronica Winrow, a friend of Carr's who had been dating him.  Winrow had gone to the apartment where Carr was staying after talking to him on the telephone earlier that evening.  When Winrow arrived at the apartment, she found the front door open and went inside.  Winrow saw Carr kneeling on the floor with a pillow over his head and then saw another young woman lying on the floor.  Winrow became frightened, ran back to the car she had arrived in and told the driver to leave.  However, after they had driven a short distance Winrow decided to return.

"The man's body found in Logan's apartment was Carr's.  He had been shot once in the head behind the left ear.  The woman's body was that of Mytra Falls, a college student.  She had also been shot, the bullet entering her left shoulder, exiting the right side of her neck and lodging in her right shoulder.  Analysis of the bullets recovered from Falls' body and from the couch on which Carr was lying revealed they could have been fired from the same gun.

"Falls had purchased cocaine from Carr on the afternoon of May 13, 1992, and made arrangements to purchase more from him later that evening.  Falls was last seen alive at approximately midnight on May 13th by a friend with whom she was staying and studying for final examinations.  In the early morning hours of May 14th, Falls made a withdrawal of $60 from her bank account using her ATM card.

"On the evening of May 13th, Carr had been out to dinner with Athena Mack, who accompanied him back to Logan's apartment where they watched a movie.  Mack left Carr at the apartment at approximately 12:00 or 12:30 a.m.  At various times during the day and evening of May 13th, Carr was seen with a large roll of money, and a small brown purse in which he often carried drugs, money, and jewelry.

"On May 19, 1992, Detective Christian Curtice of the Fresno County Sheriff's Department received information concerning an anonymous call which identified four people as being involved in the murders of Carr and Falls:  George Mason, Vance Bradshaw, and defendants Jackson and Fane.  Based on this tip all four men were arrested and interviewed.

3.

"During the first interview of Jackson, he admitted knowing Carr, and previously purchasing cocaine from him. However, he claimed he did not see Carr on May 13th or 14th, and did not go to Carr's apartment on those days. Jackson claimed to have been with his girlfriend all day. In a subsequent interview, Jackson admitted going to see Carr on the evening of May 13th with Fane, Mason, and Bradshaw to buy cocaine. Jackson stated he and Fane went into the apartment at about the same time a young woman arrived. Jackson claimed to have completed his purchase of cocaine from Carr and had returned to the car when he heard gunshots from inside the apartment. Jackson stated Fane then returned to the car.

"When Fane was first interviewed, he denied going to Carr's apartment the night the murders were committed and denied playing any part in them. Fane subsequently admitted going to Carr's apartment but continued to deny he killed anyone. Fane stated he walked up to the apartment with Jackson, but did not go inside. He claimed that while he was standing outside, a young woman entered the apartment. Shortly thereafter, Fane stated he heard shots being fired.

"Moore, who was Fane's cousin, was called as a witness by the People and testified that during the late afternoon of May 13th, he was present while Bradshaw worked on Fane's automobile. While Bradshaw was working on the engine, Fane had the trunk of his car open and was working on some stereo speakers. Moore stated he saw a handgun while the trunk was open. When he was with Bradshaw and Fane, Moore commented that he needed money and asked how he could 'come up' with some money. No one had any ideas, so Moore attempted to contact Jackson. Fane, Bradshaw, and Moore drove to Jackson's apartment, picked him up and then returned to their neighborhood where they drank beer and tried to think of a 'come up.' Moore stated they needed a gun for self-protection when they did the 'come up,' and Fane said he had one.

"Moore testified that Jackson suggested they rob a drug dealer he knew, who he described as 'a punk' and who would be easy to rob. Jackson said they could just rough this person up, take what they wanted and leave. Moore stated all four men got into Fane's car and Jackson gave Fane directions to Carr's apartment. When they arrived, Moore saw Jackson and Fane get out of the car and walk toward an apartment building. Moore and Bradshaw remained in the car. After Jackson and Fane had been gone awhile, Moore heard what sounded like two gunshots. Jackson and Fane then returned, and they drove back to their neighborhood.

"Moore testified that after they returned from Carr's apartment, Jackson had a small 'attache looking thing' from which he took money,

4.

cocaine and some rings. Moore testified Jackson divided up the contents of this purse with Fane and him, giving Moore some cocaine, money, and a ring. Moore subsequently sold the ring to a third person. The police recovered the ring and it was identified as one owned by Carr. After Jackson divided up the items in the purse, Moore asked him and Fane what happened. Fane did not say anything. However, Jackson said that while they were inside the apartment he told Fane to 'take two' and Fane shot both Carr and the young woman. Moore testified Jackson told him Carr seemed to be surprised that he was being robbed, and was bound, gagged, and on his knees when he was shot.

"Bradshaw was called as a witness by the People and asserted his Fifth Amendment right to remain silent. A transcript of his testimony at the preliminary hearing was then read to the jury. During that testimony, Bradshaw stated he saw a handgun in the trunk of Fane's car on May 13th. He also said Moore discussed a 'come up' with Fane, and that the three of them ultimately picked up Jackson. Jackson gave directions to Fane to drive to a location in an alley near some apartments. When they arrived, Jackson and Fane got out and went toward an apartment building while Bradshaw remained in the car with Moore. A short time later, Jackson and Fane returned to the car and they drove back to their neighborhood. When they arrived, Bradshaw saw a gun on the floorboard of the front seat. Bradshaw claimed he believed Fane was trying to 'open' the gun as they were driving away from Carr's apartment. Bradshaw stated Moore and he went with Jackson to his apartment later that evening and he heard Jackson say that when he and Fane went in the apartment, that a girl was there and he told Fane to 'take two.' Bradshaw claimed Fane said, 'that was a trip,' and left to go to a motel to meet his girlfriend. Before he left, Fane gave a gun to Bradshaw who, in turn, gave it to a third person.

"Bradshaw subsequently testified at trial, and reiterated much of what was in the transcript of his prior statement to the police. He also testified that when Jackson and Fane returned to the car from Carr's apartment, they were breathing hard. Bradshaw stated he subsequently observed Jackson, Fane and Moore dividing up some money and cocaine as well as a ring which came from a small pouch. In addition, he testified that after they returned from Carr's apartment, Jackson stated 'all we got is an ounce of cocaine and some money.'

"Jackson testified in his own behalf and stated he was a good friend of Carr's and had purchased cocaine from him on numerous occasions. He claimed he was using crack cocaine in the apartment of some friends on the evening of May 13th when Moore came to the door. Jackson testified

Moore wanted some cocaine and when Jackson said he did not have any, Moore suggested getting it from Carr. After obtaining money to buy some cocaine, Jackson drove with Moore, Fane and Bradshaw to a pay telephone and called Carr. Jackson claimed he did not hear any discussion about a 'come up,' or a robbery. He also testified there was no discussion about needing a gun and he never saw anyone with a gun. Jackson then gave Fane directions to Carr's apartment. Jackson testified that when they arrived in the alley outside Carr's apartment, he learned for the first time that Fane would be going in with him to purchase cocaine. As they approached Carr's apartment, Jackson stated a young woman was also walking up to the door, and she also entered Carr's apartment.

"When they entered, Carr was seated on the couch. Jackson sat on one side of Carr, the girl sat on the other, and Fane stood in front of him. Jackson testified Carr gave him a bag of cocaine, and Jackson paid him for it. Carr then produced another bag of cocaine which Jackson handed to Fane. Jackson stated at that point he got up and started walking toward the door when he heard a gunshot. He turned around and saw Fane standing over Carr and the girl starting to run. Jackson testified he immediately turned and started out the door when he heard another gunshot.

"Jackson said after the shots were fired he went back to the car, and when Fane arrived they drove to their neighborhood. Jackson claimed there was never any subsequent discussion about the robbery, he did not take any money or rings, and he did not see Fane with any money, rings or a pouch. Jackson testified that after leaving Carr's apartment, they went to Fane's house where they used cocaine. He stated the only time he said 'take two' was during a conversation with Bradshaw and Moore a day or two after the murders when he was discussing how much cocaine he was going to give Bradshaw to sell. It was during this conversation that he said 'take two,' meaning Bradshaw should take two rocks of crack cocaine to sell. Jackson stated he saw Moore sell a ring a day after the murders, but he did not know where Moore got the ring or that it was Carr's.

"Fane testified that on May 13th Bradshaw was working on Fane's car when Moore came by. Fane stated he dealt drugs, had run out earlier that day, and was looking for some more. Moore told Fane he could get some cocaine, and the three of them drove to Jackson's apartment to pick him up. Fane stated he had never met Jackson before. After they picked him up, Jackson told Fane to drive to Carr's apartment. When they arrived, Fane got out of the car with Jackson and walked toward an apartment building. When they got to the door, Jackson told Fane he would have to wait outside. Fane testified he gave Jackson some money with which to

purchase cocaine for him and Jackson entered an apartment. While Fane was waiting outside, a young woman walked up to the same apartment that Jackson had entered and went inside. Shortly after the woman arrived, Fane heard what sounded like two gunshots from inside the apartment. Fane claimed Jackson then came out of the apartment and said he got the 'stuff.' Both men returned to the car and drove back to their neighborhood.

"Fane stated that when they arrived, Jackson said he could not get any cocaine and gave Fane his money back. Fane testified he then left the other three men and went to a motel where he met his girlfriend. Fane denied ever having a gun in his car or ever hearing any discussion about a 'come up.' He also denied seeing anyone else with a gun during the evening of May 13th or the early morning hours of May 14th." (*People v. Jackson* (Aug. 17, 1998, F024945) [nonpub. opn.].)

On June 16, 1995, a jury convicted petitioner of two counts of first degree murder (§ 187; counts one-two), and one count of first degree robbery (§§ 211, 212.5; count three). The jury additionally found true two special circumstances: that the murder of Carr was committed during the commission of a robbery (§ 190.2, subd. (a)(17)), and that multiple murders were committed (§ 190.2, subd. (a)(3)). As to counts one and two, the jury also found true that petitioner personally used a firearm (§ 12022.5, subd. (a)).

On October 6, 1995, the court sentenced petitioner on counts one and two to consecutive terms of life without the possibility of parole. As to count one, the court reduced the firearm enhancement (§ 12022, subd. (a)(1)), and imposed an additional one-year term. Sentence on count three, and on the reduced firearm enhancement to count two (§ 12022, subd. (a)(1)), was imposed and stayed. (§ 654.)

On appeal, this court affirmed. (*People v. Jackson*, *supra*, F024945.)

On January 28, 2019, petitioner, in propria persona, filed a petition for resentencing pursuant to section 1170.95. In the form petition, petitioner stated that a complaint, information, or indictment was filed against him that allowed him to be prosecuted under a theory of felony murder or murder under the natural and probable consequences doctrine; he was convicted of first or second degree murder at trial; and he could not now be convicted of first or second degree murder because of changes made to

7.

sections 188 and 189, effective January 1, 2019. He further averred that he was not the actual killer, did not act with an intent to kill, and was not a major participant in the underlying felony or did not act with reckless indifference to human life in the course of the crime.

On March 29, 2019, the People filed a motion to dismiss the petition, arguing section 1170.95 is unconstitutional.[3] The People simultaneously filed an opposition on the merits to petitioner's petition. On April 3, 2019, the People filed an amended opposition on the merits, arguing the jury's finding on the robbery-murder and multiple-murder special circumstances precluded petitioner from making a prima facie showing that his conviction falls within the provisions of section 1170.95.

On June 4, 2019, the court appointed counsel to represent petitioner.

On February 24, 2020, petitioner filed a reply to the People's opposition on the merits. On May 22, 2020, petitioner filed a supplemental reply brief. On July 1, 2020, the People filed a supplemental opposition, arguing the facts underlying the offenses supported a finding that petitioner was a major participant in the underlying felony who acted with reckless indifference to human life.

On July 17, 2020, the court held a hearing and denied the petition. The court considered the facts underlying the offenses and determined that petitioner did not make out a prima facie case for resentencing relief because he was a major participant in the underlying felony who acted with reckless indifference to human life.

This timely appeal followed.

## DISCUSSION

**I.      Senate Bill No. 1437 (2017-2018 Reg. Sess.) and Section 1170.95**

Effective January 1, 2019, the Legislature passed Senate Bill No. 1437 (2017-2018 Reg. Sess.) "to amend the felony murder rule and the natural and probable consequences

---

**3**      The motion was fully briefed and eventually denied by the court.

8.

doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).) The bill accomplished this task by adding three separate provisions to the Penal Code. (*People v. Gentile* (2020) 10 Cal.5th 830, 842 (*Gentile*).) First, to amend the natural and probable consequences doctrine, the bill added section 188, subdivision (a)(3), which requires a principal to act with malice aforethought before he or she may be convicted of murder. (§ 188, subd. (a)(3); accord, *Gentile*, at pp. 842-843.) Second, to amend the felony-murder rule, the bill added section 189, subdivision (e):

> "A participant in the perpetration or attempted perpetration of [qualifying felonies] in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2."[4] (§ 189, subd. (e); accord, *Gentile*, at p. 842.)

Finally, the bill "added section 1170.95 to provide a procedure for those convicted of felony murder or murder under the natural and probable consequences doctrine to seek relief under the two ameliorative provisions above."[5] (*Gentile*, at p. 843.)

"Section 1170.95 lays out a process for a person convicted of felony murder or murder under a natural and probable consequences theory to seek vacatur of his or her

---

**4** Additionally, section 189 was amended to allow for felony-murder liability where the victim is a peace officer. (§ 189, subd. (f); accord, *People v. Daniel* (2020) 57 Cal.App.5th 666, 672, review granted Feb. 24, 2021, S266336.)

**5** The Legislature recently passed, and the Governor signed, a bill amending section 1170.95. (Sen. Bill No. 775 (2021-2022 Reg. Sess.).) The amendments are not yet effective (Cal. Const., art. IV, § 8, subd. (c)(1)) and, in any event, would not alter our analysis. We quote from the version of section 1170.95 presently in effect.

conviction and resentencing." (*Gentile*, *supra*, 10 Cal.5th at p. 853.) First, "an offender must file a petition in the sentencing court averring that: '(1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine[;] [¶] (2) The petitioner was convicted of first degree or second degree murder following a trial or accepted a plea offer in lieu of a trial at which the petitioner could be convicted for first degree or second degree murder[;] [¶] [and] (3) The petitioner could not be convicted of first or second degree murder because of changes to Section 188 or 189 made effective January 1, 2019.' (§ 1170.95, subd[]. (a)(1)-(3); see also § 1170.95, subd. (b)(1)(A).) Additionally, the petition shall state '[w]hether the petitioner requests the appointment of counsel.' (§ 1170.95, subd. (b)(1)(C).) If a petition fails to comply with subdivision (b)(1), 'the court may deny the petition without prejudice to the filing of another petition.' (§ 1170.95, subd. (b)(2).)" (*People v. Lewis* (2021) 11 Cal.5th 952, 959-960 (*Lewis*).)

Where the petition complies with the requirements of section 1170.95, subdivision (b)(1), counsel must be appointed, if requested. The prosecutor must file a response and the petitioner may file a reply. The trial court must then review the petition to determine if the petitioner has made a prima facie showing that he or she is entitled to relief. (§ 1170.95, subd. (c); *Lewis*, *supra*, 11 Cal.5th at pp. 961-963, 967.) In making this determination, the court may rely on the record of conviction. (*Lewis*, at pp. 970-971.) However, the prima facie inquiry is limited and, at this stage of the proceedings, the court "should not engage in 'factfinding involving the weighing of evidence or the exercise of discretion.' " (*Lewis*, at pp. 971-972.)

If the court determines the petitioner has met his or her prima facie burden, "the trial court must issue an order to show cause and hold a hearing to determine whether to vacate the murder conviction and to resentence the petitioner on any remaining counts. (§ 1170.95, subds. (c), (d)(1).) At the hearing, the prosecution must 'prove, beyond a

reasonable doubt, that the petitioner is ineligible for resentencing.' (§ 1170.95, subd. (d)(3).) 'The prosecutor and the petitioner may rely on the record of conviction or offer new or additional evidence to meet their respective burdens.' (*Ibid.*)" (*Gentile*, *supra*, 10 Cal.5th at p. 853.)

To demonstrate prejudice from the denial of a section 1170.95 petition before the issuance of an order to show cause, the petitioner must show it is reasonably probable that, absent error, his or her petition would not have been summarily denied without an evidentiary hearing. (*Lewis*, *supra*, 11 Cal.5th at pp. 972-974; see *People v. Watson* (1956) 46 Cal.2d 818, 836.)

## II.     The Petition was Properly Denied

Petitioner contends he set forth a prima facie claim for relief and the trial court erred in denying his petition without issuing an order to show cause. We conclude the petition was properly denied at the prima facie stage because the jury's special circumstance findings establish petitioner is ineligible for resentencing as a matter of law.

### A.     Multiple-Murder Special Circumstance

To be eligible for relief pursuant to section 1170.95, petitioner must not have been the actual killer, must not have acted with the intent to kill, and must not have been a major participant in the underlying felony who acted with reckless indifference to human life. (§§ 189, subd. (e), 1170.95, subd. (a)(3); see *Gentile*, *supra*, 10 Cal.5th at p. 842.) Here, the jury found true a multiple-murder special circumstance pursuant to section 190.2, subdivision (a)(3), which imposes a sentence of death or life without the possibility of parole when the defendant is convicted of more than one offense of murder in the first or second degree. To make such a finding, the jury was required to find that petitioner intended to kill the victims. (§ 190.2, subds. (a)(3), (c).) The jury therefore found facts sufficient to sustain the murder conviction under section 189, as amended by Senate Bill No. 1437 (2017-2018 Reg. Sess.). Petitioner is ineligible for resentencing as

11.

a matter of law, and the court was not required to issue an order to show cause. The petition was properly denied.[6] (*Lewis*, *supra*, 11 Cal.5th at pp. 970-971.)

### B. Robbery-Murder Special Circumstance

Moreover, the robbery-murder special circumstance provides an additional basis for affirming the denial of the petition. To find this special circumstance true, the jury was required to find that petitioner acted "with reckless indifference to human life and as a major participant" in aiding or abetting the commission of the underlying felony. (§ 190.2, subd. (d); *People v. Gutierrez-Salazar* (2019) 38 Cal.App.5th 411, 419.) In other words, "[t]he language of the special circumstance tracks the language of Senate Bill [No.] 1437 and the new felony-murder statutes." (*Gutierrez-Salazar*, at p. 419.) By finding this special circumstance true, the jury made the requisite findings necessary to sustain a felony-murder conviction under the amended law. Like the multiple-murder special circumstance, the jury's findings on the robbery-murder special circumstance establishes that petitioner is ineligible for resentencing as a matter of law.

Nonetheless, petitioner argues the special-circumstance finding, standing alone, is insufficient to render him ineligible for resentencing as a matter of law. In support, he relies on *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), both decided after his conviction was final.

First, *Banks* and *Clark* have no bearing on the multiple-murder special circumstance, which requires intent to kill, rather than reckless indifference to human life by a major participant. Thus, the multiple-murder special circumstance provides an independent basis for affirming the denial of the petition, irrespective of any changes in the law rendered by *Banks* and *Clark*.

---

**6** Although this rationale was not relied on by the trial court, we may uphold the court's ruling if it is supported by any legally correct theory. (*People v. Brooks* (2017) 3 Cal.5th 1, 39.)

Second, "*Banks* and *Clark* 'clarified "what it means for an aiding and abetting defendant to be a 'major participant' in a crime who acted with a 'reckless indifference to human life.' " ' [Citation.] *Banks* identified certain factors to consider in determining whether a defendant was a major participant; *Clark* identified factors to guide the determination of whether the defendant acted with reckless indifference to human life." (*People v. Gomez* (2020) 52 Cal.App.5th 1, 13, fn. 5, review granted Oct. 14, 2020, S264033 (*Gomez*).) Courts of Appeal are split on the question of whether a special circumstance finding entered prior to *Banks* and *Clark* renders a petitioner ineligible for section 1170.95 resentencing relief as a matter of law (see *People v. Jones* (2020) 56 Cal.App.5th 474, 478-479 [collecting cases], review granted Jan. 27, 2021, S265854 (*Jones*)), and our Supreme Court has granted review to decide the issue (*People v. Strong* (Dec. 18, 2020, C091162) [nonpub. opn.], review granted Mar. 10, 2021, S266606).

Courts which have held that a pre-*Banks* and *Clark* felony-murder special-circumstance finding bars section 1170.95 resentencing relief have reasoned that *Banks* and *Clark* merely clarified the law as it always was. (*Jones*, *supra*, 56 Cal.App.5th at pp. 482, 484, review granted; accord, *People v. Nunez* (2020) 57 Cal.App.5th 78, 92, review granted Jan. 13, 2021, S265918; *People v. Allison* (2020) 55 Cal.App.5th 449, 458.) These courts further note that our Supreme Court does not require juries to be instructed on the *Banks* and *Clark* clarifications. "Rather, while CALCRIM No. 703 now includes *optional* language drawn from *Banks* and *Clark* regarding the factors a jury *may consider*, '[t]he bench notes to the instruction state that *Banks* "stopped short of holding that the court has a sua sponte duty to instruct on those factors," and *Clark* "did not hold that the court has a sua sponte duty to instruct on those factors." ' " (*Nunez*, at pp. 92-93; accord, *Jones*, at p. 484; *Allison*, at pp. 458-459.) Thus, these courts found "no basis to conclude as a general matter that a pre-*Banks* and *Clark* jury was instructed differently than a post-*Banks* and *Clark* jury, or resolved different factual issues, answered different questions, or applied different standards." (*Nunez*, at p. 94.)

13.

These courts have also held that an attack on a special circumstance finding in a section 1170.95 proceeding effectively constitutes a collateral attack on the judgment. (*People v. Galvan* (2020) 52 Cal.App.5th 1134, 1142, review granted Oct. 14, 2020, S264284; *Gomez*, *supra*, 52 Cal.App.5th at p. 16, review granted.) According to these courts, a petitioner who wishes to argue the special circumstance finding is invalid under current law must first seek to invalidate that finding through a petition for writ of habeas corpus before seeking resentencing pursuant to section 1170.95. (*Galvan*, at p. 1142; *Gomez*, at p. 17; *Jones*, *supra*, 56 Cal.App.5th at p. 485, review granted.) These courts reason that a contrary interpretation "would read into section 1170.95 a new procedure allowing petitioners to ignore a special circumstance finding—no matter how well supported in the record—as well as the recognized method of challenging it. Such petitioners would be allowed to relitigate a prior jury finding at an evidentiary hearing where the prosecution bears the burden of proving the truth of the finding, beyond a reasonable doubt, a second time." (*Jones*, at p. 485.)

On the other hand, courts that have found a special circumstance finding insufficient to render a petitioner ineligible for relief have reasoned that *Banks* and *Clark* "construed section 190.2, subdivision (d) in a significantly different, and narrower manner than courts had previously construed the statute." (*People v. Torres* (2020) 46 Cal.App.5th 1168, 1179, review granted June 24, 2020, S262011, abrogated on another ground by *Lewis*, *supra*, 11 Cal.5th at pp. 962-963; accord, *People v. Harris* (2021) 60 Cal.App.5th 939, 958, review granted Apr. 28, 2021, S267802.) Thus, these courts surmised that a petitioner with a pre-*Banks* and *Clark* special circumstance finding may have been convicted based on "conduct that is not prohibited by section 190.2 as currently understood." (*Torres*, at p. 1180; accord, *Harris*, at p. 958; *People v. York* (2020) 54 Cal.App.5th 250, 258, review granted Nov. 18, 2020, S264954; *People v. Smith* (2020) 49 Cal.App.5th 85, 93, review granted July 22, 2020, S262835.) To the extent the jury's finding on a felony-murder special circumstance is legally insufficient

14.

under *Banks* and *Clark*, it cannot refute a prima facie showing of entitlement to resentencing relief. (*People v. Secrease* (2021) 63 Cal.App.5th 231, 256.) Accordingly, in considering whether a petitioner is entitled to relief pursuant to section 1170.95, the trial court must first determine whether "the evidence presented at trial was sufficient to support the felony-murder special-circumstance finding under *Banks* and *Clark*." (*Secrease*, at p. 264.)

A panel of this court has recently resolved to follow the line of authority holding that a special circumstance finding precludes relief as a matter of law. (*People v. Simmons* (2021) 65 Cal.App.5th 739, 748-749, review granted Sept. 1, 2021, S270048.) We agree. *Banks* and *Clark* did not state a new rule of law. Rather, they relied on the United States Supreme Court's decisions in *Enmund v. Florida* (1982) 458 U.S. 782 and *Tison v. Arizona* (1987) 481 U.S. 137 to clarify principles that had long been in existence at the time petitioner was convicted. (See *In re Miller* (2017) 14 Cal.App.5th 960, 978; accord, *People v. Allison*, *supra*, 55 Cal.App.5th at p. 458; *Gomez*, *supra*, 52 Cal.App.5th at p. 13, fn. 5, review granted.) *Enmund* prohibited felony-murder liability for a defendant that "did not commit the homicide, was not present when the killing took place, and did not participate in a plot or scheme to murder," and explained that, to be liable for felony murder, the aider and abettor must himself "kill, attempt to kill, or intend that a killing take place or that lethal force will be employed." (*Enmund*, at pp. 795, 797.) *Tison* held that, "major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement." (*Tison*, at pp. 151, 158.) As *Banks* noted, this language from *Tison* was later codified by the California electorate in section 190.2, subdivision (d). (*Banks*, *supra*, 61 Cal.4th at p. 800.) To the extent *Banks* and *Clark* illuminated factors a fact finder might consider in determining whether a defendant was a major contributor who acted with reckless indifference to human life, they drew those factors from *Edmund* and *Tison.* (See *Banks*, at pp. 801, 803; see also *Clark*, *supra*, 63 Cal.4th at pp. 615, 618-

15.

623.) These principles existed when petitioner was convicted and, absent a determination on direct appeal or in habeas that the evidence was insufficient to support the jury's finding, there is no basis to conclude petitioner's jury applied different standards than those described in *Banks* and *Clark*.

### C. Due Process

Finally, we reject petitioner's assertion that the denial of his petition without issuance of an order to show cause violated his constitutional rights to due process. Due process is implicated when the state attempts to deprive a defendant of some liberty interest. (*Hewitt v. Helms* (1983) 459 U.S. 460, 466, abrogated on another point by *Sandin v. Conner* (1995) 515 U.S. 472, 483, fn. 5.) But petitioner is "categorically ineligible for relief under section 1170.95." (*People v. Tarkington* (2020) 49 Cal.App.5th 892, 908, review granted Aug. 12, 2020, S263219, abrogated on another ground by *Lewis*, *supra*, 11 Cal.5th at pp. 962-963.) He thus had no liberty interest in any of the procedures afforded by section 1170.95, subdivision (c). (See *Tarkington*, at p. 908.)

## DISPOSITION

The order is affirmed.